IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.                                                        Criminal No.:  ELH-17-475

JACKIE BAGLEY
*Defendant*.

## MEMORANDUM OPINION

This Memorandum Opinion resolves a motion for compassionate release filed by the self-represented defendant, Jackie Bagley.  *See* ECF 573 (the "Motion").  Bagley pled guilty in November 2018 to conspiracy to distribute controlled dangerous substances, for which he is serving a sentence of 144 months' imprisonment.  *See* ECF 457; ECF 491; ECF 492.  According to defendant, in light of the COVID-19 pandemic, his various health conditions present extraordinary and compelling circumstances that warrant his release from prison.  ECF 573 at 1. He also asks the Court to appoint counsel to assist him in litigating the Motion.  *Id.* at 1-2.[1]

The government's opposition is docketed at ECF 613 (the "Opposition"), and it is supported by two exhibits.  Defendant has replied.  ECF 626 (the "Reply").

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.

## I.  Background

Bagley was one of thirteen people charged in a Superseding Indictment filed on October 24, 2017.  ECF 16.  Three Superseding Indictments followed, charging a total of sixteen people.

---

[1] As discussed, *infra*, the Office of the Public Defender ("OPD") has declined to represent Bagley. ECF 577.

*See* ECF 158; ECF 188; ECF 288.  In the Fourth Superseding Indictment, Bagley was charged in Count One with conspiracy to distribute "one kilogram or more of a mixture or substance containing a detectable amount of heroin, a detectable amount of cocaine, a detectable amount of cocaine base, and a detectable amount of fentanyl," in violation of 21 U.S.C. § 841.  ECF 288 at 1-3.  Count Two charged defendant with conspiracy to possess a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(o).  ECF 288 at 4.  And, defendant was charged in Count Three with possession and discharge of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924 (c)(1)(A).  ECF 288 at 5.

On November 8, 2018, defendant entered a plea of guilty (ECF 457) to Count One of the Fourth Superseding Indictment, pursuant to a Plea Agreement under FED. R. CRIM. P. 11(c)(1)(C). ECF 458 (the "Plea Agreement").  The Plea Agreement included a stipulated Statement of Facts. *Id.* at 8-9.  According to the stipulation, from January 2012 through October 24, 2017, Bagley, along with co-defendant Ernest McRae, controlled a drug trafficking organization ("DTO") that operated in the vicinity of 1100 North Montford Avenue in Baltimore and distributed "heroin, fentanyl, cocaine, and cocaine base at an open-air drug market."  *Id.* at 8.

Specifically, the Statement of Facts provided that McRae and Bagley "served as the leaders of the DTO and supplied lieutenants with drugs on a regular basis," who would, "in turn, supply street-level drug dealers . . ."  *Id.*   The street-level dealers kept "a portion of proceeds and turned over the rest of the drug proceeds to the lieutenants."  The lieutenants "then directly turned over these profits to McRae or Bagley on a nearly daily basis."  *Id.*  And, according to the Statement of Facts, on a daily basis the DTO "distributed approximately 375 to 750 ten-dollar doses of heroin to drug buyers."  *Id.*  Accordingly, the Statement of Facts indicated that over the course of his leadership of the conspiracy, "it was reasonably foreseeable to [Bagley] that the DTO distributed

2

over one kilogram of heroin."  ECF 458 at 8.  Moreover, in 2017 McRae and Bagley "began cutting the heroin with fentanyl."  *Id.*

The Statement of Facts also provided that on September 8, 2017, McRae was "arrested by ATF investigators," after which he "remained detained pending trial on a federal charges [sic]."  *Id.*  And, after McRae's arrest, "Bagley took over McRae's duties and took a more active rule in collecting drug proceeds and supplying the DTO with heroin."  *Id.*

In the Plea Agreement, the parties contemplated a base offense level of 30, pursuant to § 2D1.1(c)(5) of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines").  ECF 458, ⸿ 5(a).  And, the parties agreed that, under U.S.S.G. § 3B1.1(b), "[b]ecause of the Defendant's role as a leader in the criminal activity and the activity involved five or more participants," the offense level was subject to a four-level increase.  *Id.* ⸿ 5(b).  After deductions for acceptance of responsibility, the parties contemplated a final offense level of 31.  *Id.* ⸿ 5(d).

Notably, the parties agreed "that a sentence of 144 months (12 years) of incarceration" was the appropriate resolution of this case, in light of the nature of the instant offense, Bagley's criminal history and the sentencing factors outlined in 18 U.S.C. § 3553(a).  *Id.* ⸿⸿ 7-8.

The Presentence Investigation Report (ECF 489, the "PSR") reflected that defendant, born in 1979, was 39 years of age.  *Id.* at 2.  He had one prior criminal conviction.  *Id.* ⸿⸿ 25-26.  Specifically, defendant was convicted of "Attempt by Driver to Elude Uniformed Police by Failing to Stop."  *Id.* ⸿ 26.  He was sentenced on June 12, 2012, to a suspended sentence of one year of imprisonment and one year of probation.  *Id.*  Defendant had a Criminal History Category of II.  *Id.* ⸿ 29.

Sentencing was held on February 1, 2019.  ECF 490; *see* ECF 507 (Transcript).  Bagley was 39 years old at the time. ECF 489 at 2.  Based on a final offense level of 31 and a criminal

history category of II (ECF 492 at 1), the Guidelines called for a period of imprisonment ranging from 121 to 151 months. *Id.* And, the offense of conviction was subject to a mandatory minimum sentence of ten years' imprisonment. *See* ECF 489, ⁋ 55; *see also* 21 U.S.C. § 841(b)(1)(A).

The PSR indicated that, at the age of 28, defendant began using cocaine and, at the age of 33, he began abusing Percocet "on a daily basis." *Id.* ⁋ 45. Bagley reported that he has "never had the benefit of substance abuse treatment." *Id.* ⁋ 46. Moreover, according to the PSR, Bagley dropped out of high school in the eleventh grade. *Id.* ⁋ 47. However, defendant noted that he obtained his GED in 1997. *Id.* ⁋ 48.

Pursuant to the terms of FED. R. CRIM. P. 11(c)(1)(C), the Court imposed a sentence of 144 months' imprisonment, with credit from October 25, 2017, to be followed by a five-year term of supervised release. ECF 491 at 2-3.

In the Plea Agreement, Bagley waived many of his rights to appeal. ECF 458, ⁋ 11. Nevertheless, on February 4, 2019, Bagley appealed his sentence to the Court of Appeals for the Fourth Circuit. ECF 493. There, he argued that the sentence imposed by the Court was unreasonable because it "(1) appl[ied] an incorrect criminal history category in calculating Bagley's Sentencing Guidelines range; and (2) fail[ed] to consider Bagley's allocution and the harsh conditions of his pretrial confinement in support of his request for a lower sentence." *United States v. Bagley*, 774 F. App'x 142, 143 (4th Cir. 2019) (per curiam).[2] The Fourth Circuit rejected both arguments, first finding that because "the Maryland offense . . . satisfied the requirements of U.S.S.G. § 4A1.1(c) and (d)" the Court correctly "assign[ed] criminal history points based on that offense." *Id.* And, the Fourth Circuit determined that defendant's latter argument was either

---

[2] Pursuant to Fed. R. Evid. 201, I may take judicial notice of public docket entries, pleadings, and papers in other cases.

contradicted by or without support in the record.  *Id.* at 143-44.  Accordingly, the Court affirmed defendant's conviction and sentence.  *Id.* at 144.

Defendant represents that he is currently serving his sentence at Fort Dix FCI.  ECF 588; ECF 591; ECF 597; *see Find an Inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited October 22, 2021).[3]  He has a projected release date of June 12, 2028.  *See Find an Inmate*, *supra*.  To date, he has served approximately 33% of his twelve-year sentence.

According to defendant, if the Motion is granted, "he would reside at 4230 Stanwood Avenue, Baltimore, Maryland 202067; a four bedroom home with Darlene McDonald," who is a registered nurse.  ECF 573 at 8.  The PSR reflects that Bagley was in a relationship with Ms. McDonald for five years prior to his current term of incarceration.  ECF 489, ⁋ 37.  Further, he indicates that, upon release, he plans to work for "WRI Walters Relocation Moving Company" and he will obtain health insurance with Met Life.  *Id.*  Moreover, defendant advises that he has made "significant progress in the B.O.P.'s vocational and educational programs."  *Id.*

In the Motion, Bagley also asks the Court to appoint counsel for him.  *Id.* at 2.  On November 1, 2020, the OPD filed a letter with the Court indicating that it would not be supplementing the Motion.  ECF 577.  But, the OPD provided two documents regarding the exhaustion of defendant's administrative remedies.  Specifically, these records reflect that on August 6, 2020, defendant filed a request for compassionate release with the Warden of the

---

[3] At the time of filing the Motion, defendant was serving his sentence at Schuylkill FCI. *See* ECF 573 at 2, 5.  But, in a later filing, Bagley reported that he was transferred to Fort Dix FCI on October 8, 2020.  ECF 582.

institution where he was then incarcerated.  *See* ECF 577-1.  The request was denied soon thereafter.  *See* ECF 577-2.

In addition, subsequent to filing the Motion, defendant submitted a number of filings with the Court.  Characterized broadly, they reassert the basis of his claim for compassionate release and provide the Court with updates regarding the condition of defendant's health and the spread of COVID-19 at Fort Dix FCI.  *See* ECF 582; ECF 591; ECF 597; ECF 598; ECF 599; ECF 600.

## II. Appointment of Counsel

Bagley asks the Court to appoint counsel for him to assist in this action.  *See* ECF 573; ECF 600.  There is no constitutional right to appointed counsel in post-conviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("The right to appointed counsel extends to the first appeal of right, and no further.").  Rather, the determination to appoint counsel in this context rests solely within the discretion of the district court.  *See United States v. Legree*, 205 F.3d 724, 730 (4th Cir. 2000) (explaining that a district court has the discretion to appoint defendant counsel under 18 U.S.C. § 3582(c) in exceptional circumstances).

Bagley does not present the Court with any specific reasons as to why he should be granted counsel.  And, a review of defendant's case does not reveal any unusual or exceptional circumstances that would warrant the appointment of counsel.  Moreover, defendant has ably demonstrated the ability to articulate the legal and factual basis of his claims.  Therefore, I shall deny defendant's request for the appointment of counsel, without prejudice.

## III. Compassionate Release

### A.  Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United*

*States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was adopted as part of the Sentencing Reform Act of 1984.  Originally, a court was permitted to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA").  *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020).  As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all

administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.  *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

(i) extraordinary and compelling reasons warrant such a reduction;

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release.  *See McCoy*, 981 F.3d at 276. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C).  *McCoy*, 981 F.3d at

8

276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018.  *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)  **Medical Condition of the Defendant**.—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
>> (I)  suffering from a serious physical or medical condition,
>>
>> (II) suffering from a serious functional or cognitive impairment, or
>>
>> (III)  experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has served at least 10 years in prison or 75% of the sentence.  Application Note 1(C) concerns Family Circumstances.  Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205.  However, the Court may not rely on the Program Statement.  Rather, the Court must consider the Sentencing Commission's policy statements.  *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'"  *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").  However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act.  Thus,

10

it is only "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). In other words, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at 282; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283. Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F.Supp.3d 562, 565 (W.D. Va. 2020). If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *Dillon*, 560 U.S. at 826-27; *see also United States v. Kibble*, 992 F.3d 326, 329-30 (4th Cir. 2021) (per curiam) (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v.*

*Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).

To be sure, compassionate release is a "rare" remedy.  *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *United States v. High*, 997 F.3d 181, 187 (4th Cir. 2021) (internal quotation marks omitted).

## B.  COVID-19[4]

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[5] Defendant filed his motion for compassionate release in February 2021.  At that time, as now, the nation was still "in the grip of a public health crisis more severe than any seen for a hundred years."  *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases).  Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*

---

[4] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[5] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis.  This is because, the virus is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.

Many people who are stricken with the virus experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).  As of November 1, 2021, COVID-19 has infected more than 45 million Americans and caused approximately 745,000 deaths in this country.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Nov. 1, 2021).

Although this country saw a reduction of COVID-19 cases in prior months, the spread of the Delta variant reversed this trend. *See* Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html. (noting that, as of August 14, "[i]nfections have spiked to the highest levels in six months").  Indeed, the Delta variant is thought to be more virulent and capable of causing more severe illness than were earlier strains

of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL

AND     PREVENTION,     https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html

(updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as

previous variants").

But, in recent weeks, the trend has again become more favorable.  *See* David Leonhardt,

*Covid     Cases     Keep     Falling*,     N.Y.     TIMES,     Oct.     27,     2021,

https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html    ("The number of

new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the

magnitude of the decline is its breadth: Cases have been declining in every region."); *see also* Jon

Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1,

2021,     https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-

ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day

average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in

late September, Johns Hopkins data show.").  Even so, health authorities warn that there remain

reasons for caution, including the relatively low levels of vaccination in parts of the country, as

well as an expected increase in the number of indoor gatherings, where the virus can more easily

spread, due to the encroachment of colder weather and the impending holiday season.  *See* Kamp

& Abbott, *supra*.

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified

certain risk factors that may increase the chance of severe illness due to the virus.  Those risk

factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart

disease; obesity; diabetes; liver disease; and a compromised immune system.  *See Coronavirus*

*Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

The CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19 to reflect the most available data, most recently in October of 2021. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Oct. 14, 2021), https://bit.ly/38S4NfY. [hereinafter *Certain Medical Conditions*]. According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic lung diseases, including COPD, asthma (moderate to severe), bronchiectasis, bronchopulmonary dysplasia (chronic lung disease affecting newborns), interstitial lung disease, cystic fibrosis, and pulmonary embolism; pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathy, and hypertension; HIV; being immunocompromised; liver disease; mood disorders, including depression and schizophrenia spectrum disorder; obesity, with a body mass index ("BMI") of 25 or higher; pregnancy; sickle cell disease or thalassemia; smoking (current or former); solid organ or blood stem cell transplant; stroke or cerebrovascular disease; substance use disorders; and, tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, the CDC cautions that the "risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *Certain Medical Conditions*, *supra*.

To stem the spread of the virus, people were urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020).  However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at \*2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").  Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id*.; *see Cameron*, 2020 WL 2569868, at \*1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at \*3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at \*2 (D. Md. Apr.

3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the Bureau of Prisons ("BOP") implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[6]

---

[6] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing

---

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

the review of inmates for home confinement as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson). Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since expanded considerably, and the vaccine was recently approved for all persons five years of age and older.  *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021,  https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188.  Approximately 68% of all persons twelve years of age and older is fully vaccinated.  *See How Vaccinations Are Going in Your County and State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Nov. 1, 2021).  And, 58% of the total U.S. population is fully vaccinated.  *See id.*

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.  The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/    federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.

As of November 1, 2021, the BOP reported that 148 out of a total 133,043 federal inmates and 351 BOP staff out of some 36,000 staff members, currently test positive for COVID-19; 42,747 inmates and 8,190 staff have recovered from the virus; and 266 inmates and seven staff members have died from the virus. Moreover, the BOP has administered 239,924 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed Nov. 1, 2021).

With respect to Fort Dix FCI where defendant is imprisoned, the BOP reported that as of November 1, 2021, out of a 3,160 total of inmates, three have tested positive. And, five staff members have tested positive for COVID-19, and 1,630 inmates and 101 staff have recovered at the facility. In addition, 2,058 inmates, as well as 261 staff members, have been fully inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/, *supra*; *FCI Fort Dix*, Federal Bureau of Prisons, http://www.bop.gov/locations/institutions/ftd (last visited Nov. 1, 2021). And, according to BOP records submitted with the Opposition, defendant has "completed his vaccination against COVID-19." ECF 613 at 7; *see* ECF 613-1 at 1.

## C.  Discussion

### 1. Extraordinary and Compelling Reasons

Bagley has moved for compassionate release on the grounds that his underlying health conditions, including his weight, hypertension, and prediabetes, render him particularly vulnerable to COVID-19 and constitute an extraordinary and compelling circumstance that warrants his release from prison. ECF 573 at 3-4. Bagley also informed the Court that he contracted COVID-19 in December 2020. *See* ECF 597; ECF 598. Thereafter, defendant claims that he was "locked on a floor with 96 other positive tested inmates, and forced to self heal and endure extreme pain with little to none [sic] medical care, which amounted to the unnecessary and wanton infliction of pain and abnormalities . . . ." ECF 597 at 2.

20

The medical records provided for the defendant by the government consist of 75 pages. They show, *inter alia*, that in May 2021, the defendant weighed 176.8 pounds and is 5 feet six inches tall.  ECF 61-32 at 17.  Moreover, he has been treated for migraine headaches and sinus congestion.  And, he was evaluated after he fell from the top bunk.  *Id.* at 26, 31.  The records also confirm that he tested positive for COVID-19.  *Id.* at 34.  But, he has since been vaccinated for COVID-19.  ECF 613-1.  In the government's view, defendant's medical issues do not merit compassionate release.  ECF 613 at 8.

In the Reply, defendant rejects the government's position, arguing that although he has previously contracted COVID-19 and has been fully vaccinated, "the scientific evidence and court decisions leave no doubt that Mr. Bagley can be infected by the Delta variant and could die as a result." ECF 626 at 7.  And, defendant submits that he suffers from side-effects from his COVID-19 infection, as well as from an anxiety disorder, presbyopia, migraine headaches, and a ganglion cyst.  *Id.* at 5.  Defendant further submits that BOP staff are incapable of protecting him from COVID-19, particularly in light of the increased transmissibility and severity of the Delta variant. *See id.* at 11-14.

As a preliminary matter, defendant's prediabetes, ganglion cyst, anxiety disorder, migraine headaches, and previous COVID-19 infection are not considered by the CDC to be medical conditions that render defendant particularly vulnerable to severe illness from COVID-19. Moreover, Bagley's medical records reflect that although defendant previously contracted the virus that causes COVID-19, he did not develop symptoms.  *See* ECF 613-2 at 34, 56, 57.  And, the most recent information reported in defendant's medical records indicates that defendant stands five feet and six inches tall and now weighs 176.8 pounds.  *See* ECF 613-2 at 17, 18.  This

21

corresponds to a BMI of 28.5, which would qualify defendant as overweight, but not obese.  *See Certain Medical Conditions*, *supra*.

In any event, according to the CDC, being either obese or overweight, along with hypertension, "can make you more likely to get severely ill from COVID-19." *Id.*  Furthermore, the CDC cautions that "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in an individual." *Id.*

Defendant's vaccination reduces his risk of severe illness if he were to again contract COVID-19.  But, it does not preclude defendant from showing that his underlying medical conditions present an extraordinary and compelling circumstance.  As Judge Blake of this Court explained:

> [T]he fact that [defendant] received a vaccine does not negate that his underlying health conditions make him eligible for compassionate release. To conclude otherwise would ignore the remaining unknowns about the protection the vaccine can provide and would create a perverse incentive for prisoners . . . who seek compassionate release on the basis of medical conditions to decline the vaccine for fear it would preclude relief.

*United States v. Spriggs*, CCB-10-364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021).

And, although the evidence available to the Court indicates that the vaccines effectively reduce the risk to vulnerable individuals posed by COVID-19, recent developments make clear that the nature of the pandemic is continually evolving.  For example, the CDC has confirmed that breakthrough infections of COVID-19 among vaccinated individuals occur and, in rare cases, result in hospitalization or death.  *See COVID-19 Vaccine Breakthrough Case Investigation and Reporting*, CNTRS. FOR DISEASE CONTROL, Oct. 18, 2021, https://tinyurl.com/y34zjydc, (last accessed Oct. 25, 2021) (noting that, of the 189 million fully vaccinated Americans, 41,127 patients who suffered breakthrough infections have been hospitalized or died, as of October 18, 2021).  Moreover, the CDC has recommended that some of those who were previously considered

22

to be fully vaccinated should receive a booster shot of an authorized vaccine in order to maintain their protection against COVID-19.  *See CDC Expands Eligibility for COVID-19 Booster Shots*, CNTRS. FOR DISEASE CONTROL, Oct. 21, 2021, https://tinyurl.com/5bn52ydb,  (last accessed Oct. 24, 2021).

"At the end of the day, district judges are not epidemiologists."  *United States v. Sherrod*, 19-20139, 2021 WL 3473236, at *5 (E.D. Mich. Aug. 6, 2021).  In light of the evolving circumstances regarding COVID-19, coupled with defendant's medical issues, I conclude that Bagley's vaccination status does not render him ineligible for compassionate release.  *See United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. Jul. 29, 2021) ("It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specifical medical issues.").  I am also satisfied that defendant's health conditions qualify him for compassionate release.  *See United States v. Carter*, CCB-16-235, 2021 WL 3725425, at *2 (D. Md. Aug. 20, 2021) (granting compassionate release to a vaccinated defendant who was obese and suffered from hypertension and Hodgkin Lymphoma); *United States v. Garcia*, CCB-11-569, 2021 WL 4846937, at *2 (D. Md. Oct. 15, 2021) (finding that a vaccinated defendant's diabetes and hypertension constituted extraordinary and compelling circumstances).  That determination does not end the inquiry, however.

## 2. Sentencing Factors

The coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.).  Even where a court finds extraordinary and compelling reasons for compassionate release, relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g).  The Court must also

consider the factors set forth in 18 U.S.C. § 3553(a). *See High*, 997 F.3d at 186; *see also United States v. Butts*, ___ F. App'x ___, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam). These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims. *High*, 997 F.3d at 186.

In this case, I am persuaded that Bagley's release from prison would be inconsistent with the § 3553(a) factors.  Bagley informs the Court that, if released, he would have a place to live upon his release, an opportunity for employment, and access to health insurance. *See* ECF 573 at 8.  Defendant also asserts that he has made "significant progress in the B.O.P's vocational and educational programs." *Id.*  And, the Court notes that, prior to his conviction for the instant offense, defendant had only one criminal conviction for attempting to elude a police officer by failing to stop while driving.  ECF 489, ⁋⁋ 25-26.

However, the seriousness and duration of the instant offense, and particularly defendant's role in the offense, strongly militate against granting the Motion at this juncture.  Over the course of more than five years, defendant led a drug trafficking organization that distributed hundreds of doses of heroin on a daily basis.  ECF 458 at 8.  Moreover, defendant has only served about four years in prison, which equates to about one-third of the total sentence and less than half of the mandatory minimum sentence that Congress determined would appropriately reflect the seriousness of the offense of conviction. *See Kibble*, 992 F.3d at 332-33 (finding district court was entitled to consider amount of time defendant served and the nature of the offense as factors in

the § 355(a) analysis).    Moreover, defendant has not provided the Court with any evidence regarding his disciplinary record while incarcerated.

In my view, defendant's release at this time would not adequately ensure the safety of the community, given the recency, duration, and scope of the instant offense.    Furthermore, the abbreviated time defendant has served to date is insufficient to reflect the seriousness of the offense and to promote deterrence.    Accordingly, as I see it, a balancing of the § 3553(a) factors indicates that defendant's release from prison is not warranted at this time.

### IV.  Conclusion

For the reasons elaborated above, I shall deny defendant's Motion, as to his request for the appointment of counsel and as to his request for compassionate release (ECF 573), without prejudice.

An Order follows, consistent with this Memorandum Opinion.


Date: November 1, 2021                                     _____/s/_____

                                                          Ellen L. Hollander
                                                          United States District Judge